UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

NEW WORLD TRADING CO. LTD.,

                Plaintiff,

    - against -

2 FEET PRODUCTIONS, INC.,

                Defendant.
------------------------------------------------------X

QUANZHOU HENGYU LIGHT
INDUSTRIAL DEVELOPMENT CO.,
LTD.,

                Plaintiff,

    - against -

2 FEET PRODUCTIONS, INC.,

                Defendant.

-----------------------------------------------

**OPINION AND ORDER**

11 Civ. 6219 (SAS)
13 Civ. 1251 (SAS)

SHIRA A. SCHEINDLIN, U.S.D.J.:

I.    INTRODUCTION

        New World Trading Co. Ltd. ("New World") and Quanzhou Hengyu

Light Industrial Development Co., Ltd. ("Hengyu") (together, "plaintiffs") bring

this action against 2 Feet Productions, Inc. ("2 Feet") for breach of contract

involving the manufacture of footwear in China for resale in the United States.

Plaintiffs originally brought claims for fraud and breach of contract against 2 Feet

and 2 Feet's president, Udi Avshalomov.[1]  On September 24, 2012, I granted defendant's motion to dismiss all claims against Avshalomov as well as the fraud claim against 2 Feet.[2]  Plaintiffs' only surviving claim was for breach of contract against 2 Feet.  2 Feet subsequently asserted a counterclaim against Hengyu in the amount of $1,666,617.00 plus costs and interest.[3]

I held a bench trial from March 17 to March 19, 2014.  The parties made post-trial submissions on April 4, 2014, and supplemental submissions on April 25 and April 27, 2014.  Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, I make the following findings of fact and conclusions of law.  In reaching these findings and conclusions, I have considered the testimony, documentary evidence, demeanor of witnesses, and the arguments and submissions of counsel.

## II.    FINDINGS OF FACT

### A.    The Parties

---

[1]    *See* Complaint.

[2]    *See New World Trading Co. Ltd. v. Avshalomov*, No. 11 Civ. 6219, 2012 WL 4378055 (S.D.N.Y. Sept. 24, 2012).  Fujian Uptop Trading Co., Ltd. ("Uptop") was initially a plaintiff in this action but voluntarily dismissed its claims with prejudice on October 10, 2013.  *See* Order of Dismissal as to Plaintiff Uptop Trading, Dkt. No. 35.

[3]    *See* 2 Feet Answer.

New World is a corporation organized under the laws of China, with its offices and principal place of business in China.[4]  New World's owner and president is K.J. Kim.[5]  New World serves as an intermediary between Chinese factories and foreign wholesalers who purchase footwear.[6]  However, New World does not have an export license.[7]  Instead, New World contracts with Uptop, a trading company with an export license, to facilitate its transactions with foreign wholesalers.[8]  From January 1, 2010 through December 31, 2011, New World had a two-year contract with Uptop providing that Uptop shipped the footwear and received payments from customers.[9]

Hengyu is a footwear manufacturer organized under the laws of China, with its principal place of business in China.[10]  Hengyu's owner and

---

[4]      *See* Joint Pretrial Order ("JPTO") at 18, 21.  *See also* Trial Transcript ("Trial Tr.") at 39 (Kim).

[5]      *See* Trial Tr. at 39 (Kim).

[6]      *See* JPTO at 18, 21.

[7]      *See id.*

[8]      *See id.*

[9]      *See id.* at 18.   *See also* Plaintiffs' Exhibit ("Pl. Ex.") 17 (Translated Export Agent Agreement between New World and Uptop).

[10]      *See* JPTO at 20, 23.  *See also* Trial Tr. at 174 (Zhu).

President is Peter Zhu.[11]

      2 Feet is a footwear wholesaler incorporated under the laws of New York, with its offices and principal place of business in New York.[12]  2 Feet's President is Udi Avshalomov.[13]  2 Feet commissions the manufacture of footwear abroad and then sells the footwear to retailers in the United States.[14]

### B.    2 Feet's Contract with New World

### 1.    The Purchase Orders

      In or about 2008, 2 Feet obtained a license for the sale of Rocawear footwear, a prominent U.S. brand owned by rapper and mogul Jay-Z.[15]  The Rocawear license required 2 Feet to use only factories that met certain conditions regarding the use of lead and child labor.[16]  In late 2009, Avshalomov went to China, where he and Kim visited several factories.[17]  In the spring of 2010, 2 Feet

---

[11]    *See* JPTO at 20.  *See also* Trial Tr. at 174 (Zhu).

[12]    *See* JPTO at 20, 21.

[13]    *See* Trial Tr. at 231 (Avshalomov).

[14]    *See* JPTO at 20, 21.

[15]    *See* Trial Tr. at 232 (Avshalomov).

[16]    *See id.* at 233 (Avshalomov).

[17]    *See id.* at 68–69 (Kim); 242–244 (Avshalomov).

placed a series of orders with New World for various styles of footwear.[18]  New World produced a total of fifty purchase orders at trial.[19]  The purchase orders specify the quantity and cost of each style as well as the ship date of the order.[20] The total amount due to New World under the fifty purchase orders is $3,114,251.[21]  2 Feet argues that the purchase orders represent the terms of the parties' initial agreement.[22]

New World then contracted with approximately ten different factories in China for the manufacture of 2 Feet's orders.[23]  At trial, New World produced a business record in the form of a chart corresponding to the purchase orders.[24] Every purchase order is represented on the summary chart, although the price

---

[18]    *See* JPTO at 19, 21.

[19]    *See* Pl. Ex. 1 (purchase orders between 2 Feet and New World).

[20]    *See id.*

[21]    *See id.*  The Court was forced to make its own calculations from the documents because plaintiffs repeatedly refused to do so.

[22]    *See* Defendant's Proposed Findings of Fact, Conclusions of Law, and Post-trial Brief ("Def. Post-Trial Mem.) at 10 ("The Purchase Orders Were the Agreement between 2 Feet and New World").

[23]    *See* Pl. Ex. 2 (business record of orders placed with various factories).

[24]    *See id.*

terms are not always the same.[25]  The total "FOB amount" in the summary chart is $2,776,909.20, which New World argues is the full amount 2 Feet owed.[26]

New World also sent 2 Feet a series of "pro forma" invoices in April of 2010 confirming the purchase orders.[27]  All of the twenty-nine pro forma invoices were signed by either Avshalomov or Cindy Lee, a 2 Feet employee.[28]  The total amount due under the pro forma invoices is $2,187,220.  The price terms on the pro forma invoices do not always match those on the purchase orders or summary chart.[29]

The footwear was shipped on various dates through the summer and fall of 2010.[30]  Some of the orders were shipped to 2 Feet, while others were

---

[25]  *Compare* Pl. Ex. 1 *with* Pl. Ex. 2.

[26]  *See id. See also* Plaintiffs' Revised Post-Trial Memorandum of Law ("Pl. Post-Trial Mem.") at 9.

[27]  *See* Trial. Tr. at 80 (Kim).  "Pro forma invoice" is not a term of art, but rather a term used by the parties to describe confirmations sent to 2 Feet after the purchase orders had been placed.

[28]  *See* Pl. Ex. 5 (pro forma invoices); Pl. Ex. 1 at 6 (misplaced pro forma invoice).  *See also* Trial Tr. at 76–81 (Kim).

[29]  *Compare* Pl. Ex. 5 at 5 *with* Pl. Ex. 1 at 7–9 and Pl. Ex. 2 (purchase orders FA10-016-A/B/C).

[30]  *See* JPTO at 19, 21.

shipped directly to 2 Feet's customers, a practice known as "drop shipping."[31]

According to New World, 2 Feet paid a total of $1,918,446.85 for the shipments.[32]

2 Feet argues that it paid $1,918,446.85 to Uptop, but made additional payments

directly to the factories.[33]  2 Feet has presented bank records evidencing wire

transfers to Uptop ($1,943,446.85) and several factories ($293,005.10) between

May and December of 2010.[34]  However, 2 Feet has conceded that it paid only

$1,918,446.85 to Uptop rather than the amount evidenced by the bank records

submitted at trial.[35]  New World argues, and Kim testified, that the payments made

in May were for the previous season's orders.[36]  Subtracting the payments made in

May, 2 Feet made payments of $263,089.80 to the factories.  Therefore, including

---

[31]     *See id.*

[32]     *See id.* at 19 (proposed finding of fact by New World stating that 2
Feet paid a total of $1,918,446.85 towards the purchase orders).

[33]     *See id.* at 21.

[34]     *See* Defendant's Exhibit ("Def. Ex.") D (wire transfer records); Def.
Ex. 5V (bank statement of 2 Feet Productions, Inc. for December 2010).  While the
parties clearly agreed to transfer funds through Uptop, New World also asked 2
Feet to pay the factories directly on at least one occasion.  *See* Def. Ex. 4L (email
from Kim to Nataliya of 2 Feet); Trial Tr. at 161–162 (Kim).  Therefore, I credit
the transfers made directly to the factories as payment towards the amount due
under the purchase orders.

[35]     *See* JPTO 21. It is unclear how the parties calculated $1,918,446.85 as
the amount paid to Uptop given the bank records in Def. Ex. D.

[36]     *See* Pl. Post-Trial Mem. at 30.  *See also* Trial Tr. at 415 (Kim).

the payments made directly to the factories, I find that 2 Feet paid a total of $2,181,536.65 under the purchase orders.

## 2.    Timeliness of Deposits and Shipments

Because the footwear in question was seasonal, timeliness was critical to 2 Feet.[37]  Many of the orders were shipped after the ship dates listed on the purchase orders.[38]  2 Feet put New World on notice that it was concerned about the timeliness of some of the shipments.[39]

New World argues that the shipments were late because 2 Feet was late in providing necessary deposits.[40]  A New World business record indicates that the vast majority of 2 Feet's deposits were late, often by as much as seventy to a hundred days.[41]  In response, 2 Feet argues that deposits were never part of the parties' agreement.[42]  Indeed, most of the purchase orders contain "Net 60"

---

[37]    *See* Trial Tr. at 332–333 (Avshalomov).

[38]    *See id.* at 258–259 (Avshalomov).  *See also* Trial Tr. at 385 (Ross) (testifying that Finish Line boot orders arrived late); Def. Ex. 3M (email from New World employee to 2 Feet employee admitting late deliveries).

[39]    *See* Def. Ex. J, V, 5F, 5N (emails sent from 2 Feet to New World between June and August 2010 complaining of shipment delays).

[40]    *See* Trial Tr. at 84 (Kim).

[41]    *See* Pl. Ex. 19 (New World chart recording dates of deposits).

[42]    *See* Trial Tr. at 249 (Avshalomov).

payment terms and do not appear to require initial deposits.[43]

However, some of the purchase orders indicate that an initial deposit of twenty percent is required.[44]  Similarly, many of the pro forma invoices signed by Avshalomov or Cindy Lee list deposits of twenty or thirty percent.[45] Avshalomov's testimony that he never agreed to provide any deposits on the purchase orders is not credible.[46]  Although Avshalomov argues that New World attempted to spring the deposits on him belatedly, he personally signed many of the pro forma invoices containing deposit terms.[47]  Moreover, he admitted on cross-examination that he had made deposits to New World on the previous season's orders.[48]

Therefore, I find that 2 Feet was required to submit deposits on many of the purchase orders, and failed to do so in a timely manner.  New World put 2 Feet on notice on various occasions that delays in deposits would result in delays

---

[43]    *See* Pl. Ex. 1 at 1–14, 17–19, 24–26, 31–51.

[44]    *See id.* at 15, 16, 20–23, 27–30 (listing "20% deposit, 80% net 50").

[45]    *See* Pl. Ex. 5.

[46]    *See* Trial Tr. at 244, 249 (Avshalomov).

[47]    *See* Pl. Ex. 5.

[48]    *See* Trial Tr. at 298 (Avshalomov).

in shipment.[49]  2 Feet has failed to prove that the shipment delays were caused by New World rather than by 2 Feet's own failure to timely pay deposits.

### 3.     Quality Issues

As the orders began to ship in the summer and fall of 2010, 2 Feet received complaints from some of its customers about the quality of the shoes.[50]  2 Feet repeatedly complained to New World about the quality of the shoes.[51]  In late November of 2010, Kim traveled to New York to inspect the shoes in 2 Feet's warehouse in New Jersey.[52]  Afterwards, Kim emailed Avshalomov about his observations.[53]  He admitted that the grey Mens Son of Roc shoes "seemed to be discolored a little" on the outsole, and that he had learned from the factory that one outsole maker had used an overwaxed outsole.[54]  He stated, "I can well understand

---

[49]     *See* Pl. Exs. 8, 9, 11, 13, 14, 15 (emails from New World to 2 Feet in May and June of 2010 putting 2 Feet on notice that delays in deposits would result in shipping delays).

[50]     *See* Trial Tr. at 261 (Avshalomov).

[51]     *See id.* at 152 (Kim), 156 (stipulation by plaintiffs' counsel that notice was given), 256–257 (Avshalomov).

[52]     *See id.* at 97 (Kim), 347 (Kestenman).

[53]     *See* Def. Ex. 4D (emails from Kim to Avshalomov on 11/30/10 discussing his inspection of the merchandise at 2 Feet's warehouse).

[54]     *Id.*

if this wax seems as a quality problem to some customers."[55]  Kim explained that

he had tried to clean the grey Mens Son of Roc shoes with shoe clean oil to get rid

of the wax coating.[56]  With respect to the "kids boots", he wrote: "I believe you can

sell shoes if you can explain on oil resistance/waterproof of outsole."[57]  As further

evidence of quality problems, New World informed 2 Feet in September 2010 that

the factory had agreed to a thirty percent discount on 2880 pairs of "Guide on kids

balance" shoes from purchase order FA10-064.[58]  At trial, Kim testified that he saw

no quality problems with the shoes whatsoever during his visit to the warehouse.[59]

However, he admitted on cross-examination that there had been problems with

some of the shoes.[60]

> One of 2 Feet's customers for the purchase orders in question was a

---

[55]     *Id.*

[56]     *See id.*

[57]     *Id.*

[58]     Def. Ex. 3J (email from Barbie at New World to Cindy of 2 Feet dated
September 30, 2010).

[59]     *See* Trial Tr. at 97 (Kim).

[60]     *See id.* at 154 (Kim).  Kim's testimony with respect to the quality of
the shoes was inconsistent and not credible.  Kim initially testified that he was
unaware that 2 Feet had ever made complaints about the quality of the shoes.
However, on cross-examination he admitted that he had received emails
complaining about quality.  *See id.* at 148, 152 (Kim).

retail company called Finish Line.  Donald Ross, a former employee of Finish Line, testified that the boots he purchased from 2 Feet arrived late and were significantly lower quality than what was agreed upon.[61]  According to Ross, the boots arrived with "chalky substances" on the sole and were generally of "K-mart" quality rather than premium quality.[62]  Ross testified that Finish Line knew it could not sell those shoes at full price, and was forced to "pull the banners out [of] the windows" and "take the ad off the website."[63]  Many of the shoes that were still in the warehouse were sent back to 2 Feet.[64]  For the shoes that were already in stores, significant chargebacks were taken.[65]  Ross did not know the actual amount of the chargebacks, nor did he know how many shoes were charged back or returned.[66]

2 Feet was forced to "dump" the returned merchandise at discount retailers or in Mexico for a fraction of the price.[67]  2 Feet was ultimately able to sell

---

[61]     *See id.* at 384–385 (Ross).

[62]     *Id.*  Nate Kestenman, a friend of Avshalomov, also testified that he personally examined dozens of New World shoes that had serious quality problems.  *See id.* at 353 (Kestenman).

[63]     *Id.* at 389, 394 (Ross).

[64]     *See id.* at 384, 395–396 (Ross).

[65]     *See id.* (Ross).

[66]     *See id.* at 400–401 (Ross).

[67]     *Id.* at 266 (Avshalomov).

all but six pairs of the shoes, but often at a high discount.[68]  Avshalomov testified

that he had to sell some of the shoes for $5 or $10 per pair when he would

normally receive $25 to $37 per pair,[69] and that he lost a total of $1.5 million due

to the quality defects in New World's shoes.[70]  However, Avshalomov did not

establish how many of the shoes were sold at a discount or at what price.  Nor did

he provide any supporting documentation for the transactions or explain his

calculations in any detail.[71]

### 4.    Settlement Negotiations

In December of 2010, Avshalomov and Kim met in Avshalomov's

office in New York.[72]  Nate Kestenman, an old friend of Avshalomov's, testified

that he was present during this meeting.[73]  According to Avshalomov and

Kestenman, the parties negotiated price reductions based on the problems with the

---

[68]      *See id.* at 314 (Avshalomov).

[69]      *See id.* at 287 (Avshalomov).

[70]      *See id.* at 287–288, 335–336 (Avshalomov).

[71]      Avshalomov insisted that he had given plaintiffs a copy of his
invoices for the damaged shoes that were sold at a discount.  *See id.* at 266
(Avshalomov).  However, no such invoices were introduced at trial.

[72]      *See id.* at 266 (Avshalomov), 407 (Kim).

[73]      *See id.* at 347 (Kestenman).

shoes and agreed upon a final settlement.[74]  According to Kestenman, the

settlement was in the range of $900,000.[75]  Kim testified that no such agreement

was ever reached.[76]

> On December 15, 2010, Kim sent Avshalomov an email saying:
>
> Thank you so much for the wiring of $502,887.00 of the Hengyu payment.  Our trading company received and forward to Hengyu today.  Below detail is the for Balance $471,223.32 from total $974,110.32 as I confirmed yesterday.  Very appreciated $471,223.32 is wire to below address today.  So we can finish all past things and can start with you and factories for the promising future business quickly.[77]

Kim copied a prior email from his employee Helen, which explained the

breakdown of the remaining $471,223.32.  Specifically, Helen asked 2 Feet to send

$45,000 to Fullmean, $155,140.20 to New Sun, and $271,083.12 to Uptop.[78]   On

December 21, 2010, Kim asked 2 Feet to wire $45,000 to Fullmean,, $158,175.84

to New Sun, and $176,235.91 to Uptop.[79] On December 23, 2 Feet wired $45,000

---

[74]     *See id.* at 352–354 (Kestenman); 274–275 (Avshalomov).

[75]     *See id.* at 354 (Kestenman).

[76]     *See id.* at 100–101 (Kim).

[77]     Def. Ex. 4L.

[78]     *See id.*

[79]     *See* Trial Tr. at 161 (Kim).

to Fullmean, $112,814.90 to New Sun, and $171,339.85 to Uptop.[80]

### C.   2 Feet's Contract with Hengyu

#### 1.   Fall 2011

##### a.   The Purchase Orders

Some of the purchase orders 2 Feet placed with New World for delivery in the fall of 2010 were manufactured by Hengyu.[81]  Avshalomov testified that the shoes made by Hengyu were of high quality.[82]  Zhu traveled to New York with Kim in November or December of 2010 because he still had not received payment for shoes that had been shipped in August or September.[83]  Avshalomov agreed to pay Zhu in full, and proceeded to make the transfers a few weeks later.[84]

2 Feet subsequently placed orders directly with Hengyu for the fall 2011 season.[85]  A total of seven purchase orders were provided to the Court in Def.

---

[80]      *See* Def. Ex. 5V.

[81]      *See* Pl. Ex. 2. *See also* Trial Tr. at 263 (Avshalomov).

[82]      *See* Trial Tr. at 263 (Avshalomov).  *See also id.* at 284, 320 (Avshalomov) (testifying that he was willing to continue working with Kim in 2011 only if Kim used Hengyu to manufacture the footwear).

[83]      *See id.* at 175–176 (Zhu).

[84]      *See id.  See also* Def. Exs. D, 4L.

[85]      *See* Trial Tr. at 177 (Zhu).

Ex. 21, six of which were signed by Avshalomov.[86]  Both parties agree that these

purchase orders constitute their initial agreement for the fall 2011 season, with the

exception of one purchase order that Zhu testified was missing.[87]  Plaintiffs did not

provide any evidence of the value of the missing purchase order.  The purchase

orders have ship dates on them, and state: "if the shipment is delayed 14 days, 2

Feet Productions will deduct 10% from the invoice.  Delays of 21 days or more,

will result in a 25% reduction off the invoice or we reserve the right to cancel the

order."[88]

   The total amount due under the purchase orders is $1,428,996.

However, plaintiffs claim only a total of $1,373,794.20 under the 2011 orders.[89]   2

Feet made multiple payments towards these orders, including a payment of

$150,000 on October 24, 2011; a payment of $250,000 on October 27, 2011; a

---

[86]  *See* Def. Ex. 21.  Although the fourth purchase order is not signed, 2 Feet does not contest its validity.

[87]  *See* Trial Tr. at 205–208 (Zhu), 336 (Avshalomov).

[88]  Def. Ex. 21 at 2, 4, 6, 8, 10, 12, 14.

[89]  *See* JPTO at 20; Pl. Post-Trial Mem. at 22.  Plaintiffs appear to have taken this figure from Def. Ex. 4Z (charts on Hengyu letterhead setting out various discount scenarios and total amounts due) at 2 (indicating a total amount due of $1,373,794.20).  Similarly, Zhu testified that the total amount due under the 2011 purchase orders was $1,370,000.  *See* Trial Tr. at 177 (Zhu).

payment of $290,000 on November 17, 2011; and a payment of $349,761.59.[90]

Therefore, I find that 2 Feet paid a total of $1,039,761.59 towards the

$1,373,794.20 originally due, leaving a remainder of $334,032.61 – the amount

sought by Hengyu for the 2011 orders.

### b. Timeliness and Quality Defects

Zhu admitted that many of the 2011 orders were not shipped on

time.[91] However, he explained credibly that the tardiness usually resulted from 2

Feet's consistent delays in providing samples, quality approvals, and arranging for

shipping.[92] Avshalomov did not deny Zhu's explanation or attempt to show that 2

Feet was timely in complying with its obligations.

Avshalomov testified that there were many quality problems with the

2011 fall orders from Hengyu. Specifically, he testified that the shoes had the

wrong logo and were not stitched correctly.[93] He further complained that the shoes

had been farmed out to multiple factories, and therefore did not match one another

---

[90]    *See* Def. Ex. 4Z; Trial Tr. at 219, 225 (Zhu) (confirming that the four
payments listed in Def. Ex. 4Z were in fact made by 2 Feet).

[91]    *See* Trial Tr. at 179 (Zhu).

[92]    *See id.* at 178–181 (Zhu). However, on cross-examination, Zhu
admitted that sometimes the factories could not "prepare the material" and
"assemble the products" in time to meet the ship dates. *Id.* at 212 (Zhu).

[93]    *See id.* at 291 (Avshalomov).

or the samples.[94]

On cross-examination, Avshalomov admitted that Hengyu did not begin subcontracting with other factories until the 2012 orders, and that Hengyu had manufactured the 2011 shoes itself.[95]  I find Avshalomov's testimony regarding the quality of the 2011 Hengyu orders to be inconsistent and not credible.

### c.    Negotiations

2 Feet and Hengyu engaged in discussions throughout the fall of 2011 to resolve their dispute over the price of the goods.  On December 27, 2011, Ms. Zhu, a Hengyu employee, emailed several 2 Feet employees and stated that Mr. Zhu had authorized her to "discuss payment" with them.[96]  She said that Mr. Zhu had agreed to deduct $80,998 and hoped that they could pay $500,000.[97]  Mr. Zhu testified that he did not believe he ever authorized Ms. Zhu to offer such a deduction, but later admitted that he might have done so.[98]

------

[94]    *See id.* at 292 (Avshalomov).

[95]    *See id.* at 337 (Avshalomov).

[96]    Def. Ex. 4R (email from Ms. Zhu of Hengyu to various 2 Feet employees).

[97]    *See id.*

[98]    *See* Trial Tr. at 215–216, 221 (Zhu).

Hengyu also drew up multiple documents on its own letterhead illustrating various discounts and varying total amounts owed.[99]  None of the charts are dated.[100]  One of the charts indicates a total due to Hengyu in the amount of $349,761.59.[101]  Avshalomov testified that he reached a final settlement with Zhu in December of 2011.[102]  Although Zhu admits that a payment of $349,761.59 was made, he testified that it was only one of many payments demanded, and that no final agreement was ever reached.[103]  Peter Ye also testified that he was present at all of Zhu's meetings with Avshalomov, and that no settlement ever took place.[104] Ye was an unreliable witness and I do not credit his testimony.[105]

### 2.    Spring 2012

Zhu testified that 2 Feet placed a second set of orders with Hengyu for

---

[99]    *See* Def. Ex. 4Z.

[100]   *See id.*

[101]   *See id.* at 4.  Both parties testified that the other had placed the final figure of $349,761.59 on the chart.  *See* Trial Tr. at 220 (Zhu), 344 (Avshalomov).

[102]   *See* Trial Tr. at 293 (Avshalomov).

[103]   *See id.* at 225 (Zhu).

[104]   *See id.* at 427 (Ye).

[105]   For example, Ye testified that he worked at a restaurant in Maryland but could not remember the name of the restaurant.  *See id.* at 434 (Ye).

delivery in the spring of 2012.[106]   However, after the purchase orders were placed, the Chinese government seized Hengyu's manufacturing facilities and Zhu was forced to contract out the orders to other factories.[107]   Zhu testified that he told 2 Feet about the situation, and 2 Feet told him to go ahead with the orders.[108]   Zhu claims damages in the amount of $27,600 based on an order of 2,760 pairs of shoes at $10 per pair that he shipped at 2 Feet's request.[109]   Plaintiffs have not provided any documentary proof of the order.[110]

With respect to quality, Zhu admitted that the factory placed the wrong logo on the sole of the footwear in question.[111]   However, he testified that the problem was minor and easily fixed.[112]   According to Zhu, 2 Feet did not cancel the order, but rather asked Zhu to fix the logo and proceed with shipment.[113]

---

[106]     *See id.* at 195–196 (Zhu), 292 (Avshalomov).

[107]     *See id.* at 182–183 (Zhu).

[108]     *See id.* at 184 (Zhu).

[109]     *See id.* at 196–197 (Zhu).

[110]     Zhu testified that he lost many of Hengyu's records when the Chinese government bulldozed his factory.  *See id.* at 183 (Zhu).

[111]     *See id.* at 213 (Zhu).

[112]     *See id.* (Zhu).

[113]     *See id.* at 197, 213 (Zhu).

Avshalomov testified that the logo problem was far more serious than a switched sticker, and that he was ultimately forced to sell the shoes in Mexico for about $5 per pair.[114]  Avshalomov testified that he already paid Zhu for the shoes in question, but provided no proof of payment at trial.[115]

## III.   APPLICABLE LAW

### A.   Amendment of Pleadings

"In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including . . . accord and satisfaction."[116] Ordinarily, failure to plead an affirmative defense in the answer results in waiver of that defense.[117]  However, when a request to amend the pleadings is made before trial, "[t]he court should freely give leave when justice so requires."[118] Amendment to pleadings during or after trial is governed by Rule 15(b):

> If, at trial, a party objects that evidence is not within the issues raised in the pleadings, the court may permit the pleadings to be amended.  The court should freely permit an amendment when

---

[114]    *See id.* at 338–340 (Avshalomov).

[115]    *See id.* at 340 (Avshalomov).

[116]    Fed. R. Civ. P. 8(c).

[117]    *See, e.g., Moon v. United States,* No. 08 Civ. 1990, 2011 WL 181741, at *9 (S.D.N.Y. Jan. 13, 2011) (citing *Mooney v. City of New York*, 219 F.3d 123, 127 n.2 (2d Cir. 2000)).

[118]    Fed. R. Civ. P. 15(a)(2).

doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits.[119]

Rule 15(b) is "intended to promote the objective of deciding cases on their merits rather than in terms of the relative pleading skills of counsel."[120]  "'[A] party cannot normally show that it suffered prejudice simply because of a change in its opponent's legal theory.  Instead, a party's failure to plead an issue it later presented must have disadvantaged its opponent in presenting its case.'"[121]

### B.    Breach of Contract Under the United Nations Convention on Contracts for the International Sale of Goods ("CISG")[122]

Both parties agree that the CISG governs this dispute.[123]  Under the CISG, "[t]he seller must deliver the goods, [] if a date is fixed by or determinable

---

[119]    Fed. R. Civ. P. 15(b).

[120]    *Brandon v. Holt*, 469 U.S. 464, 471 (1985) (quotation marks and citations omitted).

[121]    *DiMare Homestead, Inc. v. Alphas Co. of New York, Inc.,* 547 Fed. App'x 68, 70 (2d Cir. 2013) (quoting *New York State Elec. & Gas Corp. v. Secretary of Labor,* 88 F.3d 98, 104 (2d Cir. 1996)) (affirming district court's decision to permit amendment of pleadings at trial because defendant had not "put forward any category of new evidence [that] would have supported its defense").

[122]    *See* CISG, *entered into force* Jan. 1, 1988, 1489 U.N.T.S. 3.

[123]    *See* Def. Post-Trial Mem. at 10; Pl. Post-Trial Mem. at 1.

from the contract, on that date."[124] "The seller must deliver goods which are of the quantity, quality and description required by the contract and which are contained or packaged in the manner required by the contract."[125] "The seller is liable in accordance with the contract and this Convention for any lack of conformity which exists at the time when the risk passes to the buyer."[126] "If the goods do not conform with the contract and whether or not the price has already been paid, the buyer may reduce the price in the same proportion as the value that the goods actually delivered had at the time of the delivery bears to the value that conforming goods would have had at that time.[127] The buyer may take a price reduction under Article 50 unilaterally.[128] However, if the reduction is challenged in court, the buyer bears the burden of proving the reasonableness of the reduction.[129] "If the

---

[124]   CISG art. 33(a).

[125]   *Id.* art. 35(1).

[126]   *Id.* art. 36(1).

[127]   *Id.* art. 50.

[128]   *See id.  See also* Lillian V. Blageff, *Recent Cases Interpreting the Convention on Contracts for the International Sale of Goods,* 23 No. 1 Intl Quarterly ART 1 (2011) ("Article 50 of the CISG provides a buyer with the unilateral right to reduce the amount of payment to a seller for nonconforming goods.").

[129]   *See Chicago Prime Packers, Inc. v. Northam Food Trading Co.,* 408 F.3d 894, 898 (7th Cir. 2005) (holding that "under the CISG, the buyer-defendant bears the burden of proving nonconformity [of goods] at the time of transfer");

seller delivers only a part of the goods or if only a part of the goods delivered is in conformity with the contract, the [price reduction remedy applies] in respect of the part which is missing or which does not conform."[130]

"If the buyer fails to perform any of his obligations under the contract or this Convention, the seller may . . . claim damages. . . ."[131]  "Damages for breach of contract by one party consist of a sum equal to the loss, including loss of profit, suffered by the other party as a consequence of the breach."[132]  "A party may not rely on a failure of the other party to perform, to the extent that such failure was caused by the first party's act or omission."[133]  "A contract may be modified or terminated by the mere agreement of the parties."[134]

## IV.    CONCLUSIONS OF LAW

---

*Norfolk S. Ry. Co. v. Power Source Supply, Inc.,* Civ. A. 06-58 J, 2008 WL 2884102, at *4 (W.D. Pa. July 25, 2008) ("Whether Defendant's assertions are treated as defenses or counterclaims, Defendant has the burden of showing that the goods Plaintiff delivered did not conform to the terms of the Parties' agreement."); *Berry v. Ken M. Spooner Farms, Inc.,* C05-5538FDB, 2009 WL 927704, at *3 (W.D. Wash. Apr. 3, 2009) ("The burden of proof is on the buyer to prove that the product was defective at the time of delivery.").

[130]    CISG art. 51(1).

[131]    *Id.* art. 61(1).

[132]    *Id.* art. 74.

[133]    *Id.* art. 80.

[134]    *Id.* art. 29(1).

### A.    Amendment of Pleadings

2 Feet's Answer did not assert the affirmative defense of accord and satisfaction against either plaintiff.[135]  Defendant first raised the defense with respect to Hengyu in the JPTO and pre-trial memorandum.[136]  With respect to New World, the defense was not raised until the first day of trial.[137]  Plaintiffs argue that defendant waived the affirmative defense by failing to raise it in a timely manner. Indeed, this case has been pending since November of 2011, and defense counsel has proffered no excuse or explanation for the delay.

However, several of the documents produced in discovery clearly evidence negotiations between the defendant and both plaintiffs.[138]  Therefore, plaintiffs were on notice that defendant might argue that the parties had reached a settlement or contract modification, even if no formal motion to amend the pleadings was made.  Moreover, all parties were permitted to present evidence on the alleged settlement at trial.  Kim, Zhu, and Ye all testified that no final agreement had been reached to settle the plaintiffs' respective disputes with 2 Feet.

---

[135]    *See* 2 Feet Answer.

[136]    *See* JPTO at 8, 23; Defendant 2 Feet Productions, Inc.'s Trial Memorandum of Law at 9.

[137]    *See* Trial Tr. at 21–24 (defense counsel opening statement).

[138]    *See* Def. Exs. 4Z, 4L, 4R.

Plaintiffs argue that if they had known Kestenman was going to testify about an alleged settlement, they would have insisted on deposing him before trial.[139]  However, plaintiffs had every opportunity to cross-examine Kestenman at trial, and have identified no other category of discovery that they might otherwise have pursued.  Therefore, I find that plaintiffs will suffer no prejudice from the late amendment.

Moreover, permitting amendment serves the ends of justice in this case.  Holding defendants liable for $858,000 based on their counsel's pleading error, without reaching the merits of the case, would lead to an unjust outcome.  For the above reasons, defendants' motion to amend their Answer to conform to the proof at trial is granted.[140]

## B.   New World's Claim

New World has provided a total of fifty individual purchase orders, which it compiled into a business record documenting the price breakdown of each

---

[139]   *See* Pl. Post-Trial Mem. at 13.  According to plaintiffs, Kestenman never appeared for his deposition after it was noticed by defendants.  *See id.*

[140]   Because the CISG does not contain an explicit provision for accord and satisfaction *per se*, the defense may also be conceptualized as a contract modification.  Under the CISG, a contract modification may be reached by the mere agreement of the parties without additional consideration.  *See* CISG art. 29(1).

order.[141]  While the prices in the purchase orders do not match the prices in the

summary chart, New World seeks to recover the *lower* of the two amounts.[142]

        However, I conclude that 2 Feet and New World reached a settlement

or contract modification in December of 2010.  Because the parties presented

conflicting testimony on this point, I give great weight to the documentary

evidence.[143]  It is clear from the parties' email communications that negotiations

and discounts were occurring regularly over the course of their business

relationship.[144]  Indeed, the price terms on the purchase orders, pro forma invoices,

and summary chart do not always match, suggesting that the parties negotiated

changes in price after the initial orders were placed.

        Both Kim and Avshalomov testified that a meeting took place in

Avshalomov's office in December of 2010.[145]  On December 15, 2010, Kim

emailed Avshalomov to thank him for a prior payment and request a final payment

---

[141]    *See* Pl. Ex. 2.

[142]    *Compare* Pl. Ex. 1 (totaling $3,114,251*) with* Pl. Ex. 2 (totaling
$2,776,909.20).

[143]    While Avshalomov and Kestenman testified that the parties negotiated
price reductions and agreed upon a final settlement, Kim testified that no final
agreement was ever reached.  *See* Trial Tr. at 352–354 (Kestenman), 274–275
(Avshalomov), 100–101 (Kim).

[144]    *See, e.g.,* Def. Ex. 3J.

[145]    *See id.* at 266 (Avshalomov), 407 (Kim).

in the amount of $471,223.32.  He wrote, "very appreciated $471,223.32 is wire to below address today.  So we can finish all past things and can start with you and factories for the promising future business quickly."[146]  Kim copied a prior email from his employee Helen, which explained the breakdown of the remaining $471,223.32.  Specifically, Helen asked 2 Feet to send $45,000 to Fullmean, $155,140.20 to New Sun, and $271,083.12 to Uptop.[147] On December 23, 2 Feet wired $45,000 to Fullmean, $112,814.90 to New Sun, and $171,339.85 to Uptop.[148]  Plaintiffs introduced no evidence that New World made any further demands for payment over the following months.

Given the sequence of events and the language of Kim's email, I find that the parties reached an accord in the amount stated in Kim's December 15 email.[149]  Because 2 Feet only paid $329,154.75 of the agreed upon $471,223.32, 2 Feet still owes New World $142,068.57.

### C.     Hengyu's Claim

---

[146]    Def. Ex. 4L.

[147]    *See id.*

[148]    *See* Def. Ex. 5V.

[149]    Although Kim later emailed 2 Feet with a different set of requested payments, there is no evidence that 2 Feet agreed to those values.  *See* Trial Tr. at 161 (Kim).

### i.     2 Feet Has Not Established a Settlement or Modification With Hengyu

2 Feet argues that it reached an agreement with Hengyu to settle their disputes in December of 2011.  Again, the testimony is conflicting.  Avshalomov testified that an agreement was reached, while Zhu testified that he urged 2 Feet to make smaller payments but never agreed to forgive the remaining balance.[150]  The documents support 2 Feet's theory that the parties were engaged in negotiations.  For example, on December 27, 2011, Ms. Zhu, a Hengyu employee, offered 2 Feet a deduction of $80,998.[151]  Similarly, Hengyu drew up various discount scenarios on its letterhead showing varying total amounts due.[152]  However, the charts are all different, and it is impossible to tell which scenario was ultimately endorsed by the parties, if any.  Therefore, although 2 Feet has established that settlement negotiations took place, it has not carried its burden of proving that a final agreement was reached with Hengyu.

### ii.     2 Feet Has Not Established That Hengyu Breached the 2011 Purchase Orders Through Late Delivery or Quality Defects

Although Zhu admitted that many of the 2011 orders were not shipped

---

[150]     *See id.* at 293 (Avshalomov); 225(Zhu).

[151]     *See id.*

[152]     *See* Def. Ex. 4Z.

on time, he explained credibly that the tardiness usually resulted from 2 Feet's consistent delays in providing samples, quality approvals, and arranging for shipping.[153]  Avshalomov did not deny Zhu's explanation or attempt to show that 2 Feet was timely in complying with its obligations.  Therefore, 2 Feet has not borne its burden of demonstrating that the delays in shipping were Hengyu's fault.  Moreover, 2 Feet has not provided any quantitative evidence of the damages it allegedly suffered as a result of any shipping delays.

2 Feet has similarly failed to sustain its burden of demonstrating quality defects in the 2011 order.  Aside from Avshalomov's uncorroborated testimony, 2 Feet has provided no evidence that the 2011 merchandise was damaged, nor has it produced any communications with Hengyu about the quality of the fall 2011 orders.  Additionally, 2 Feet has not provided any evidence of chargebacks or discounts it was forced to give as a result of the alleged quality problems.  Because 2 Feet has failed to establish either the existence or the extent of quality defects with respect to the 2011 fall orders, 2 Feet is liable for the full $334,032.61 sought by Hengyu.

### iii.   Hengyu Has Not Established the Amount Due Under the 2012 Orders

---

[153]   *See id.* at 178–181 (Zhu).  However, on cross-examination, Zhu admitted that sometimes the factories could not "prepare the material" and "assemble the products" in time to meet the ship dates.  *Id.* at 212 (Zhu).

Both parties acknowledge that 2 Feet placed some orders with Hengyu in 2012.[154]  However, Hengyu has provided no documentary evidence of the terms of those orders, and relies solely on Zhu's testimony that 2 Feet owed him for 2,760 pairs of shoes at $10 per pair.[155]  I find Zhu's uncorroborated testimony insufficient to establish the quantity and price of the 2012 shoes.  Therefore, I conclude that Hengyu has failed to sustain its burden of proving a breach of contract with respect to the 2012 orders.

### D.      2 Feet's Counterclaim against Hengyu

2 Feet asserts that it lost $1,666,000 as a result of the lateness and quality problems on the Hengyu orders from 2011 and 2012.[156]  *First,* 2 Feet has failed to establish any quality problems with respect to the 2011 orders.  *Second,* 2 feet has failed to provide any evidence of the amount of its damages.  Therefore, 2 Feet's counterclaim against Hengyu is dismissed.

### V.      CONCLUSION

For the foregoing reasons, I find that 2 Feet breached its contracts with New World and Hengyu by failing to pay the full amounts owed.  2 Feet is

---

[154]      *See id.* at 337 (Avshalomov).

[155]      *See id.* at 197 (Zhu).

[156]      *See* Def. Post-Trial Mem. at 14.

liable in the amount of $142,068.57 to New World and $334,032.61 to Hengyu, plus pre-judgment interest as provided by Article 78 of the CISG.[157]  The parties are directed to submit letter briefs addressing the appropriate interest rate and the date from which interest should accrue.  The letters may not exceed three single-spaced pages and must be submitted by Friday, May 23, 2014.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     May 16, 2014
           New York, NY

---

[157]     Post-judgment interest will accrue in accordance with 28 U.S.C. § 1961(a).  *See Chowdhury v. Worldtel Bangladesh Holding, Ltd.*, 746 F.3d 42, 45 n.1 (2d Cir. 2014).

**- Appearances -**

**For Plaintiffs:**

Michael J. Calvey, Esq.
Michael J. Calvey, LLC
8000 River Road, Suite 10D
North Bergen, NJ 07047
(201) 442-0851

**For Defendant:**

Desmond C.B. Lyons, Esq.
Kyle C. McGovern, Esq.
Diane B. Cavanaugh, Esq.
Lyons McGovern, LLP
399 Knollwood Road, Suite 216
White Plains, NY 10-603
(914) 631-1336

Russell Marc Yankwitt, Esq.
Yankwitt LLP
140 Grand Street
White Plains, NY 10601
(914) 686-1500